IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Case No. 2:07-cr-209(2) |
| | : | JUDGE ALGENON L. MARBLEY |
| KARL A. DEMMLER, | : | |
| Defendant. | : | |

## OPINION AND ORDER

### I. INTRODUCTION

Defendant Karl Demmler was indicted on obstruction-of-justice and witness-tampering charges on October 23, 2007. The Government moved for an order detaining Demmler pending trial. Following an evidentiary hearing, Magistrate Judge Kemp held that the Government had not sustained its burden of establishing that Demmler is either a flight risk or dangerous, such that it is necessary to detain him prior to trial. The Magistrate Judge therefore ordered Demmler released, subject to several conditions, including electronic monitoring.

Presently before the Court is the Government's motion to revoke the Magistrate Judge's release order. The Court agrees with the Magistrate Judge that the requirements for detaining Demmler are not satisfied, and so **DENIES** the Government's motion.

### II. BACKGROUND

Demmler is accused of conspiring with his co-defendant, Lance Poulsen, to influence the testimony of a third person, identified in the indictment as "Witness A." Witness A is a former

1

executive at National Century Financial Enterprises (NCFE), who has pleaded guilty to criminal fraud charges and is expected to testify against Poulsen in *United States v. Poulsen*, No. 06-129, pending before this Court. Poulsen served as Chairman and Chief Executive Officer of NCFE between 1990 and NCFE's bankruptcy in 2002. He now faces 360 months to life in prison on charges of criminal fraud in *Poulsen* in connection with NCFE's offering of two billion dollars in securities.

According to the criminal complaint filed in this matter, Demmler and Poulsen are long-time acquaintances. Poulsen and his NCFE colleagues used to frequent a Columbus restaurant owned by Demmler. The complaint alleges that beginning in March 2007 and continuing until their arrests in late October 2007, Demmler and Poulsen conspired together to convince Witness A to alter her expected testimony at trial so as not to implicate Poulsen in any wrongdoing. Demmler served as the go-between, relaying instructions and promises to pay from Poulsen to Witness A and communicating Witness A's questions and monetary demands back to Poulsen. In return for facilitating the arrangement between Poulsen and Witness A, Poulsen agreed to pay Demmler a percentage of the money that Witness A was to receive.

Unfortunately for Demmler, the Government discovered his scheme with Poulsen, presumably because Witness A, who pleaded guilty to the charges brought against her, informed the Government of what Demmler and Poulsen had planned. Through a court-ordered wiretap and consensual recordings, the Government captured conversations between Poulsen and Demmler discussing how Witness A should suffer memory lapses on the stand and how she should be paid, as well as conversations between Demmler and Witness A discussing the same.

Demmler and Witness A met in person several times, beginning in June 2007. According

to the criminal complaint, Demmler can be heard on the recordings telling Witness A that "money laundering is my business," that he had an offshore bank account and planned on opening up another one, and that he could set up an offshore account for Witness A, if she desired. In terms of how she should alter her trial testimony, Demmler advised Witness A that she should answer the prosecution's questions by saying that she does not recall, and when asked to identify handwriting on NCFE documents, she should say that she does not recognize it as either her own or Poulsen's. During various of their conversations, Demmler told Witness A that "it's not what you make up, it's what you forget," and that she should develop a case of "amnesia" at trial. In a conversation on July 13, 2007, Demmler made comments that could be regarded as threats against judges in this District, including that, if he had his way, he would "hang every goddamn one of them." Referring to a bankruptcy judge of this Court who handled a matter involving Demmler at some unspecified date, Demmler said that he would like to "cut him [the bankruptcy judge] up in pieces and feed him to the fish."

At the evidentiary hearing before Magistrate Judge Kemp, FBI Special Agent David Britton testified about his investigation into Demmler's and Poulsen's alleged witness-tampering conspiracy. Britton confirmed that the wire-intercept and consensual recordings capture Demmler orchestrating the deal between Poulsen and Witness A. He also testified about the threatening remarks Demmler made about judges in this District and added that Demmler also said he would like to choke to death Witness A's attorney. Britton testified that the FBI has taken certain precautions to protect Witness A against the possibility of retaliation by Demmler, but conceded that Demmler had not specifically threatened Witness A, and that the FBI did not have any other specific evidence suggesting that he would seek to do so.

3

Testifying about Demmler's personal characteristics, Britton noted that Demmler describes himself as a money-launderer on the recordings and talks about his money-laundering activities in Venezuela and Panama. Demmler is also heard talking about his offshore bank accounts, his regular use of fraudulent credit cards, his possession of fraudulent identity documents, and his refusal to pay taxes.

Demmler was arrested at Port Columbus Airport preparing to board a flight to Venezuela. He had on him a credit card in the name of "Norman Demmler," Japanese currency that appeared to be counterfeit, and promissory notes and bonds drawn on foreign governments that also appeared to be fake.

Finally, Britton testified that the recordings collected by the Government reflect conversations in which Demmler talked about approaching two other defendants in *Poulsen* to convince them to join the scheme to interfere with those proceedings.

A report prepared by Pre-Trial Services sets forth information about Demmler's employment and criminal history. Demmler is fifty-five years old and has resided in central Ohio his entire life. He apparently has not been employed for a number of years, but he previously owned and operated an inn, which he sold in the mid-1990s. Before that, Demmler owned a hot-air-balloon business. Demmler supports himself by periodically liquidating personal assets that currently total $575,000, by doing odd jobs, and by running some type of legal-research service from his residence.

Demmler's criminal record consists entirely of charges for non-violent offenses, most of which were committed in his twenties. He has several charges for driving under the influence, the most recent of which occurred in 1992. The closest Demmler has come to a violent offense

4

is disorderly-conduct and resisting-arrest charges brought against him when he was twenty-three, and charges for using a weapon while intoxicated and improperly handling a firearm when he was twenty-five. More recently, in November 2006, Hamilton County, Ohio issued a felony warrant for Demmler's arrest, stemming from a charge for passing bad checks.

The Pre-Trial Services report concludes by recommending Demmler's release subject to several conditions, including that he be electronically monitored, and resolve his outstanding felony warrant in Hamilton County within fifteen days.

### III. STANDARD OF REVIEW

In considering the Government's motion to revoke, the Court reviews the record de novo, "and must make an independent determination of the proper pretrial detention or conditions for release." *United States v. Garnett*, No. 07-00093, 2007 U.S. Dist. LEXIS 62168, *2 (S.D. Ohio Aug. 23, 2007). The Court may order Demmler detained pending trial only if it determines that there are no conditions which, if imposed on Demmler's release, will reasonably assure his appearance and further assure that he does not pose a danger to any other person. 18 U.S.C. § 3142(e). The Court considers the following factors in making its detention determination: (1) the nature and circumstances of the offenses charged, including whether they are crimes of violence; (2) the weight of the evidence against Demmler; (3) Demmler's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by Demmler's release. 18 U.S.C. § 3142(g). "The government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or the community by clear and convincing evidence." *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004) (unpublished).

5

## IV. ANALYSIS

The Court agrees with the Magistrate Judge's conclusion that the Government has not established that Demmler presents a risk of danger or flight such that detaining him pre-trial is necessary. Although there are some cases which give rise to a presumption of detention, this is not one of them. Such a presumption attaches when, among other things, the defendant: (1) is charged with a crime of violence, or controlled-substances offense, that carries a maximum sentence of ten years or more of imprisonment; (2) is charged with a felony and was previously convicted of two or more offenses involving ten or more years of imprisonment; or (3) is charged with a felony that involves a minor victim or dangerous weapon, such as a firearm. 18 U.S.C. §§ 3142(e) & (f)(1).

The Court is mindful of the reality that pretrial detention may "hinder [a defendant's] ability to gather evidence, contact witnesses, or otherwise prepare for his defense," *Barker v. Wingo*, 407 U.S. 514, 533 (1972), and thus the Court has a duty to order Demmler detained only if there are *no* conditions under which his appearance and lack of dangerousness can reasonably be assured.

### A. Whether Demmler Will Obstruct Justice in These Proceedings

At the outset, the Court notes that some Circuits, and a court in this District, have held that a defendant's dangerousness to the community or to any person is not enough to justify his detention unless one of the conditions in 18 U.S.C. § 3142(f)(1) applies. *See United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) (stating that "a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention"); *United States v. Ploof*, 851 F.2d 7, 12 (1st Cir. 1988) ("Insofar as in the present case there is no longer any

6

contention that any of the subsection (f)(1) conditions were met, pre-trial detention solely on the ground of dangerousness to another person or to the community is not authorized."); *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986); *United States v. LaLonde*, 246 F. Supp. 2d 873, 875 (S.D. Ohio 2003) ("Because the statute does not permit the detention of a defendant who does not satisfy any of the conditions of § 3142(f), regardless of his dangerousness to the community or to specific others, the Magistrate Judge erred by ordering Defendant detained in this case."). Because the Government does not contend that any of the conditions set forth in § 3142(f)(1) are applicable here, it is tempting to conclude that there need not be any inquiry into Demmler's alleged dangerousness. But this is overly simplistic. Section 3142(f)(2) authorizes the Government to request a detention hearing if there is a serious risk that the defendant will flee or "a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." This provision plainly requires consideration of the defendant's dangerousness, but focuses that inquiry not on the general risk of harm that he may pose to society, but on whether he will seek to subvert justice, through violent means or not. The Court therefore evaluates Demmler's dangerousness through the prism of § 3142(f)(2).

As described above, Demmler does not have a violent criminal history. Although the offenses Demmler is accused of committing—obstruction of justice and witness tampering—could certainly be carried out through the use of violence, there is no evidence that that is the case here. The Government does not allege that Demmler resorted to intimidation or coercion to compel Witness A's cooperation with his and Poulsen's scheme.

The Government argues that obstruction of justice and witness tampering represent a

7

threat to the integrity of judicial proceedings. Citing to the Second Circuit's decision in *United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000), the Government appears to contend that the charges against Demmler automatically warrant a finding that detention is appropriate because the disrespect for judicial authority evinced by Demmler's conduct shows that he cannot be trusted to abide by this Court's orders now. Without diminishing the gravity of the obstruction and witness-tampering charges of which Demmler stands accused, the Court declines to adopt a *per se* rule that these offenses necessarily demand that defendants be held in custody pending trial. *See e.g. LaLonde*, 246 F. Supp. 2d at 875-76 (vacating magistrate judge's order detaining the defendant even though, in past prosecutions, the defendant had contacted witnesses and had used a private investigator to learn the identities of potential witnesses against him). No case cited by the Government, including *LaFontaine*, sweeps so broadly.

*LaFontaine* was a revocation-of-bail case; it did not involve, as here, an initial determination as to whether the defendant should be detained or released. In fact, LaFontaine had been on pre-trial release for nearly two years when the Government moved to revoke on the grounds that she had violated the conditions of her release by contacting witnesses, and had engaged in obstruction and witness tampering by attempting to influence the testimony of witnesses. 210 F.3d at 128. The district court agreed that LaFontaine had violated the conditions of her release and that there was probable cause to believe that she had committed witness tampering and perjury. *Id.* at 130. The latter finding triggered the rebuttable presumption that there were no set of circumstances under which LaFontaine could be released. Accordingly, the district court remanded her to federal custody. *Id.*

On appeal, LaFontaine argued that even if she did commit witness tampering, there was

no evidence that she had employed violence in doing so, and that therefore her detention was improper. *Id.* at 134. The Second Circuit rejected this contention, holding that neither findings of actual violence, nor threatened violence, are necessary prerequisites to detaining a defendant accused of witness tampering. *Id.* That is to say, even a non-violent witness tamperer could be deemed dangerous.

*LaFontaine* thus stands for the unremarkable proposition that the detention of a person charged with witness tampering may be proper, even in the absence of evidence of violence, but that it is not required. Considering that detention decisions must be based on the individual facts and circumstances of each defendant, and considering also the distinctions between *LaFontaine* and this case—that *LaFontaine* had to do with revoking two-year-old release terms, but this case has to do with setting them, and the defendant in *LaFontaine* was accused of tampering with witnesses in her own criminal proceeding, but Demmler is accused of tampering in exchange for payment in someone else's case—the Court declines to order Demmler detained based solely on the offenses he is charged with committing.

The Government also argues that Demmler represents a danger because of the threats he has made against judges in this District and Witness A's lawyer. The Court is disturbed by Demmler's professed desire to "hang every goddamn one of" the judges who preside in this District and "cut [a bankruptcy judge] up in pieces and feed him to the fish." Although Demmler does not appear to be prone to violence, remarks such as these can hardly be ignored, and the Court gives them some weight in its assessment of whether Demmler presents a risk of harm. Nonetheless, the statements in question were made on July 13, 2007, and the Government concedes that there is no evidence that Demmler took any steps toward acting on them between

9

their utterance in July and his arrest three months later. Moreover, the Court has not heard the recordings on which Demmler made these threats and thus lacks probative information about the context in which they were said. Of course, Demmler need not be on the verge of consummating a plan to kill for this Court to deem him a danger, but the statements at issue here do not, by themselves, require holding Demmler in custody. Again, Demmler does not have a violent criminal record; he did not use violence to commit the charged offenses; he has not sought to carry out his threats; there is no evidence that he presently possesses firearms or any other dangerous weapons, or has ambitions to procure them; he has never before been charged with obstruction of justice or witness tampering; and he apparently has no history of emotional disturbance, which might be relevant to assessing his dangerousness.

Case law supports the Court's conclusion that Demmler's threatening comments, while troubling, do not provide an adequate reason for detaining him. The Court has not identified any case, and the Government has not pointed to one, in which a defendant who made threatening statements was detained on that basis alone. Indeed, the norm appears to be that defendants who have made threats are detained only if they also have been charged with violent crimes, or if there is evidence that they have violent criminal histories, both of which trigger the presumption of detention. *See e.g. United States v. Henderson*, No. 96-221, 1997 U.S. Dist. LEXIS 1604, *6 (N.D.N.Y. Feb. 14, 1997) (ordering the defendant detained where he threated to kill if he learned that anyone "was wearing a wire," but where the presumption of detention also applied); *United States v. Trammel*, 922 F. Supp. 527 (N.D. Okla. 1995) (granting the government's motion to revoke the magistrate judge's release order where the defendant made threatening statements about a confidential informant, but where the statutory presumption in favor of detention applied

and where the defendant had engaged in "a life of crime," including burglary, obstruction, and posession of narcotics).

Simply put, the threshold for detaining a defendant pre-trial, even one who has engaged in threatening behavior, is not easily satisfied. In *United States v. Brannon*, No. 00-2037, 2000 U.S. App. LEXIS 3234 (10th Cir. March 2, 2000) (unpublished), for example, the Tenth Circuit affirmed an order releasing the defendant pre-trial, even though the defendant was charged with using the mail to threaten a federal judge, had a history of mental and emotional disorders and of making "veiled or oblique" threats, and his family testified in favor of detaining him. In *United States v. Traitz*, 807 F.2d 322 (3d Cir. 1986), the defendants were charged with racketeering, embezzlement, and extortion. Government tapes recorded the defendants physically abusing their victims and threatening them. The Third Circuit affirmed the district court's release order, concluding that the district court did not err in holding that conditions of release could be fashioned to prevent the defendants from posing a danger. *United States v. Ippolito*, 930 F. Supp. 581 (M.D. Fla. 1996), perhaps best highlights just how egregious threatening behavior has to be to overcome the law's general preference for pre-trial release. There, the district court revoked the magistrate judge's order of release because the defendants (1) did not recognize the jurisdiction of any state or federal court; (2) had conspired for more than two years to convey threatening communications to witnesses, jurors, judges, court personnel, prosecutors, and investigators; (3) had tangibly interfered with two federal trials; and (4) had threatened to physically assault the targets of their communications and have them arrested by the "militia."

Finally, the Court will not assume that just because Demmler has been charged with witness tampering and obstruction of justice, he is likely to commit these same offenses again

during the course of these proceedings. Indulging such an assumption would be tantamount to creating a *per se* rule of detention in cases involving witness tampering and obstruction, which this Court has already declined to do. True, the Government alleges that Demmler talked about enlisting other defendants in the underlying *Poulsen* case in his and Poulsen's scheme, but whether Demmler would have followed-up on these musings had he not been arrested, and whether he would do so now, are entirely speculative. It is just as likely, on this record, that Demmler's arrest on federal charges has chastened, rather than emboldened, him.

For these reasons, the Court concludes that Demmler does not present a danger necessitating pre-trial detention. Conditions of release can be imposed that will neutralize whatever limited risk of harm he may pose.

### B. Whether Demmler is Likely to Flee

The Government argues that Demmler is a flight risk due to his apparently illicit money-laundering activities, and the resources that he may have at his disposal through offshore bank accounts, fraudulent credit cards and identification documents, and counterfeit currency. The Government has not conclusively determined that Demmler has offshore bank accounts but, since Demmler himself revealed this information, the Government asks the Court to take him "at his word."

Here, the purported existence of Demmler's offshore accounts and access to counterfeit currency and documents does not demand that he be detained. Demmler has been a life-long resident of central Ohio and his family ties are limited to Ohio and the Midwest generally. There is no evidence that Demmler has the kind of substantial personal or business relationships in any other jurisdiction that would cause him to seek refuge there. *See United States v. Giordano*, 370

12

F. Supp. 2d 1256 (S.D. Fla. 2005) (denying motion to detain despite the defendant's access to significant resources with which to finance his flight, his extensive travel in foreign countries, and his family connections in Italy); *United States v. Sharma*, No. 03-80146, 2004 U.S. Dist. LEXIS 28244, *10-11 (S.D. Fla. May 24, 2004) (ordering the defendant detained because "the Defendant has familial and business ties to India" and "the Defendant stated that if he ever got into any trouble, all he had to do was get on a plane to New Delhi, India, where he could easily secure a fraudulent death certificate through his political connections and disappear"). Moreover, as Magistrate Judge Kemp noted, Demmler's mother is in poor health and Demmler has taken responsibility for providing some of her care. This situation reasonably might be expected to deter Demmler from fleeing. Finally, Demmler is facing a maximum of five years of imprisonment. While no doubt unpalatable to him, it is not the kind of extended jail time that might otherwise motivate a defendant to flee.

In any event, electronic monitoring will adequately alert law enforcement if Demmler attempts to flee. This is not to suggest that electronic monitoring is one-hundred percent effective in all cases, or that it cannot be evaded, but given the otherwise low likelihood of flight here, the Court concludes that electronic monitoring will provide a sufficient additional safeguard against Demmler's attempts to elude this Court's jurisdiction.

## V. CONCLUSION

For the foregoing reasons, the Court denies the Government's motion to revoke. The Court orders Demmler released, subject to the conditions recommended by Pre-Trial Services, including electronic monitoring.

**IT IS SO ORDERED.**

___s/Algenon L. Marbley___<br>
**ALGENON L. MARBLEY**<br>
**United States District Court Judge**

**DATED: November 2, 2007**